[Civ. No. 10655. First Appellate District, Division One.—May 26, 1938.]

BESSIE DeFREECE et al., Petitioners, v. INDUSTRIAL ACCIDENT COMMISSION et al., Respondents.

Alfred C. Skaife and A. L. Crawford for Petitioners.

E. A. Corten and Eldon B. Spofford for Respondents.

THE COURT.—Clark DeFreece died January 20, 1935, as the result of injuries received in December, 1933, while in the employ of a laundry company. The insurance carrier furnished all necessary medical aid and paid him compensation from the date of the injury until his death, at which time an additional sum was paid for funeral expenses. Thereafter the petitioners herein filed with the Industrial Accident Commission their joint application for compensation on account of his death, and after a hearing on the merits the application was denied. Petitioners then instituted this proceeding in *certiorari* for the purpose of having the commission's decision reviewed and annulled.

The application filed with the commission was based upon the ground that at the time the decedent was injured and at the time of his death, petitioners were members in good faith of his family and household, and therefore were entitled to compensation under the provisions of subdivision c, section 14, of the Workmen's Compensation Act. The commission found against them, however, on that issue, and the determinative question here presented is whether, as petitioners contend, said finding is wholly unsupported by the evidence.

There is little dispute as to the facts, the controversy having arisen mainly over the conclusions drawn from those facts. It appears therefrom that Bessie DeFreece (who will be hereinafter referred to as petitioner) formerly lived in the

state of Washington. She was married to one Marion J. Lennox; and Donald and Theda Lennox (the other two petitioners) aged respectively twenty and eighteen years at the time of DeFreece's death, were the issue of the Lennox marriage. In 1918 petitioner separated from Lennox in Washington, and in 1922 moved with her children to the home of her parents in San Jose, California, where on May 6, 1927, she obtained an interlocutory decree of divorce from Lennox. She had known DeFreece in Washington, and a few months subsequent to her arrival in San Jose he moved to that city. Contemplating marriage, they purchased a home in San Jose in their joint names, and early in September, 1928, which was more than one year after the entry of the interlocutory decree of divorce, and believing, so she claimed, that the final decree had been entered, they went to Reno, Nevada, to be married. They arrived there on the Sunday before Labor Day, and petitioner claimed that they were informed that the marriage license office was closed, and that a license to marry could not be obtained until Tuesday morning. She further claimed that DeFreece was obliged to be back at work in California on Tuesday morning, so they entered into an oral common-law marriage contract (which contracts were recognized as valid in the state of Nevada), went to an auto camp in Reno Sunday night, and registered and cohabited as husband and wife. The next day they returned to San Jose, announced to their relatives and friends that they had been married, and thereafter lived together as husband and wife until the death of DeFreece. Some of the time petitioner's children lived with them. During such relationship they filed a homestead on their home, and acquired other property in their joint names, as husband and wife. In the meantime and shortly after DeFreece was injured they went to Oregon, one of the purposes of the trip being to have a marriage ceremony performed, but they abandoned the idea upon learning that in that state one of the prerequisites to marriage was the obtaining and presentation of a health certificate, which they feared DeFreece, on account of his injured condition, would be unable to secure, so they returned to San Jose, and as stated, lived together as husband and wife until DeFreece died. Immediately following DeFreece's death, petitioner consulted an attorney in San Jose with the view to filing an application for compensation, and she learned

for the first time, so she claimed, that her final decree of divorce had never been granted and that her common-law marriage was illegal. She ascertained also that the attorney whom she had employed to obtain the divorce had since died, whereupon, through the services of another attorney and on January 25, 1935, a final decree of divorce was obtained and entered. More than two years later and on April 8, 1937, acting under the authority of a new code section (Civ. Code, sec. 133), which became effective approximately eight months after the date on which her final decree was entered, she obtained an amended final decree purporting to restore her to the status of a single person as of May 8, 1928; but obviously such was not the effect of the amended decree, because the section provides that a final decree *nunc pro tunc* may be granted when "by mistake, negligence or inadvertence" a final decree *"has not been signed, filed or entered"* (italics ours); and here admittedly the final decree had been signed, filed and entered two years before. In fact, from the beginning petitioner has conceded that since her marriage to Lennox was not dissolved until after DeFreece's death, she was never the legal wife of DeFreece.

 With respect to the law of the case, one of the most recent decisions dealing with the question here involved is *MacArthur* v. *Industrial Acc. Com.*, 220 Cal. 142 [29 Pac. (2d) 846], wherein the leading earlier cases are reviewed, discussed and differentiated; and it is there held in effect that where a woman, living with an employee at the time of his death, but who is not legally married to him, seeks compensation on account of his death upon the theory that she was a member in good faith of his household, it is essential for her to prove not only that she was living with him under the belief in good faith that she was legally married to him, but she must show also some basis in fact upon which she was entitled to found such belief; and that the question of whether her evidence meets such requirement is one of fact for the commission to determine. For example, the claim of the applicant was upheld in *Temescal Rock Co.* v. *Industrial Acc. Com.*, 180 Cal. 637 [182 Pac. 447, 13 A. L. R. 683], wherein the evidence showed that the contracting parties were ignorant Mexicans who obtained a license to marry and thereafter cohabited as husband and wife under the belief that the license was sufficient to constitute in itself a valid marriage;

also in *Louden* v. *Industrial Acc. Com.,* 105 Cal. App. 65 [286 Pac. 1045], wherein both parties belonged to Indian tribes, and the marriage was solemnized in the "Indian way", which was recognized and considered among the two tribes to which they belonged as binding and effective as marriages solemnized in the "white man's way"; and again in *Landsrath* v. *Industrial Acc. Com.,* 77 Cal. App. 509 [247 Pac. 227], wherein "the positive first hand testimony of the petitioner was that a marriage ceremony had been performed", and the details thereof given; while in two other cases like the one before us, wherein it was the intention of the parties to contract purely "common law" marriages, and no claim was made of solemnization of any kind, the applications for compensation were disallowed. (*MacArthur* v. *Industrial Acc. Com., supra,* and *Taylor* v. *Industrial Acc. Com.,* 131 Cal. App. 468 [21 Pac. (2d) 619].) In the former case the "common law" marriage was contracted in British Columbia; thereafter the claimant and the decedent lived together as husband and wife up to the time of his death, a period of about eleven years; and the applicant testified that at all times she believed that she was lawfully living with the deceased employee as his wife, and that they had contracted a valid "common law" marriage. And in the latter case the applicant testified that a few days after she began living with the decedent as his wife the matter of a marriage ceremony was discussed and the decedent said that they were just as good as married—"it is a state law"; that she believed him, and therefore lived with him as his wife up to the time of his death, a period of eighteen years.

In our opinion the present case is not even as strong in favor of petitioner as were the two cases last mentioned in favor of those applicants, for the reason that in those cases the applicants not only explained the reasons for having entered into common-law marriages, but testified that at all times they believed they were legally married; whereas here petitioner offered no explanation why, if she believed she had been divorced, she resorted to a common-law marriage, more than to say "there are reasons for it"; and that she was at all times doubtful as to the validity of such marriage is quite obvious from the following portion of her own testimony: "And so after we got over there (to Reno) and couldn't get married, when we came back we just said we were and we

never could go ahead and have it done after that around here because everyone would know it. So, when we went up in Oregon, he was sick, we tried to have it done there, but he had to have a health certificate and couldn't. Mr. Prothero (counsel for respondents): You just decided to live together as husband and wife. A. Yes, because everyone knew what we went for and we had to let it go that way. That is the whole reason of it." Furthermore, as additional evidence tending to support the inference drawn by the commission that petitioner did not believe in good faith she was legally married is the circumstance of the trip to Oregon to have her marriage solemnized in the manner prescribed by law.

In any event, under the rule the question of whether she did believe in good faith that her common-law marriage was legal was one of fact for the commission to decide, and in view of all the circumstances above set forth we are not prepared to hold that the conclusion it has drawn therefrom is unsupported.

As to the claims of Donald and Theda Lennox, it will suffice to say that on account of the illegal marriage between their mother and DeFreece they did not bear unto DeFreece the relationship of stepson and stepdaughter; nor does the evidence disclose that either was a member in good faith of his household or dependent on him for support. Quite to the contrary, it appears that most of the time Donald Lennox lived with and was cared for by his grandmother, and that Theda Lennox lived with and was maintained by an aunt.

The decision of the commission is affirmed.

An application by petitioners to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 25, 1938.